To be argued by:
SOLOMON NEUBORT
(15 Minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

             -against-

GARNELL THOMPSON,

                    Defendant-Appellant.

Appellate Division
Docket Number
05-11985

Kings County
Indictment Number
3289/2004

RESPONDENT'S BRIEF

LEONARD JOBLOVE
SOLOMON NEUBORT
Assistant District Attorneys
      of Counsel

June 15, 2007

**CHARLES J. HYNES**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

<u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................... 1

STATEMENT OF FACTS ...................................... 2
    Introduction ........................................ 2
    The Trial ........................................... 3
        The People's Case ............................... 3
        The Defendant's Case ........................... 14
    The Brady Claim .................................... 14
    The Charge Conference, the Verdict, and the
        Sentence ....................................... 23

POINT I                                                 25

    THE   TRIAL   COURT'S   PRECLUSION   OF   POLICE   REPORTS
    CONTAINING SEVERAL CONFLICTING ACCOUNTS OF HEARSAY WAS
    PROPER AND ANY DELAY IN PROVIDING THE DEFENSE WITH
    UNREDACTED COPIES OF THOSE REPORTS DID NOT PREJUDICE
    THE DEFENSE. ....................................... 25
        Introduction ................................... 25
        Determination of Brady Claims .................. 29
        There  Was  No  Meaningful  Delay  Of  Brady
            Material ................................... 32
        Defendant Was Not Prejudiced By The Delay .......... 32
        Alleged  Statements  Were  Not  Declarations
            Against Penal Interest .................... 33
        Escuza-Related  Testimony  Would  Not  Have
            Affected Trial Outcome .................... 44
        Reasonable  Probability  Standard  Governs
            Review Of This Claim ...................... 47
        The Police Investigation Claim Is Unpreserved
            For Review ................................ 51
        The Police Investigation Claim Is Meritless ........ 52

POINT II                                                54

    DEFENDANT'S  CLAIM  THAT  HE  WAS  DENIED  A  FAIR  TRIAL
    BECAUSE  THE  COURT  ELICITED  HEARSAY  EVIDENCE  FROM  A
    PROSECUTION WITNESS IS UNPRESERVED FOR APPELLATE REVIEW
    AND MERITLESS. ..................................... 54

CONCLUSION                                              61

    FOR ALL OF THE ABOVE REASONS, DEFENDANT'S JUDGMENT OF
    CONVICTION SHOULD BE AFFIRMED. ..................... 61

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

              -against-

GARNELL THOMPSON,

                    Defendant-Appellant.

Appellate Division
Docket Number
05-11985

Kings County
Indictment Number
3289/2004

RESPONDENT'S BRIEF

PRELIMINARY STATEMENT

Defendant, Garnell Thompson, appeals from a judgment of the Supreme Court, Kings County, rendered November 15, 2005, convicting him, after a jury trial, of Murder in the Second Degree (P.L. § 125.25[1]), for which he was sentenced to an indeterminate term of imprisonment of twenty-five years to life (Feldman, J., at trial and sentence).   Defendant is incarcerated pursuant to his judgment of conviction.

## STATEMENT OF FACTS

### Introduction

On August 16, 2003, at about 1:30 a.m., at the Irving Square Park in the Bushwick section of Brooklyn, defendant fired multiple gunshots at his ex-girlfriend Julissa Feliciano, killing her. Moments before the shooting, Julissa pointed to defendant and identified him to an eyewitness as her jilted lover and said to the eyewitness that defendant had been stalking her and that he was going to kill her. The eyewitness identified defendant in a police arranged lineup.

For these acts, defendant was charged, under Kings County Indictment Number 3289/2004, with Murder in the Second Degree (P.L. § 125.25[1]), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02[4]).

The Trial[1]

The People's Case

During the summer of 2003, Julissa Feliciano lived variously with her stepfather, HONORIO LOPEZ, with her Aunt IRIS VELASQUEZ, and with defendant (Lopez: 109, 110-11; Velasquez: 220-21, 223, 224, 227).[2]  Julissa told Ms. Velasquez that, although she was having sex with defendant, they were not lovers (Velasquez: 254).[3]  Defendant, who was a very close friend of Ms. Velasquez's husband, would visit the Velazquez's on a daily basis (Velasquez: 222, 224, 226; IRENE TORRES: 189-90).  A few days before Julissa was killed, defendant brought a bag of clothes to the Velasquez residence and told Ms. Velasquez, "Here this is your niece's, the bitch's clothes" and "I told her not to come to my house no more" (Velasquez: 227-29).  On another visit a few days before Julissa was killed, defendant told Ms. Velazquez that he was "fed up" with Julissa's "shit" and "that he was going to put a cap on her," which Ms. Velasquez understood as a threat to beat or kill

---

[1] A pretrial <u>Dunaway/Wade</u> hearing commenced on August 6, 2005.  Because defendant does not challenge on appeal the hearing court's rulings pertaining to that hearing, the hearing is not summarized here.

[2] Un-prefaced numbers in parentheses refer to the pages of the trial transcript and numbers preceded by "PT" refer to the pages of the pretrial transcript.  Names preceding page numbers refer to the witnesses whose testimony is cited.

[3] In 1993, Ms. Velasquez pled guilty to attempted sale of a controlled substance, for which she was sentenced to probation (Velasquez: 225).

Julissa (Velasquez: 229, 230).    During yet another visit,
defendant told Ms. Velasquez that he was "fed up with [Julissa's]
bullshit" because they knew too many things about each other and
that he was going to put a cap on her (Velasquez: 231).

During that summer, Julissa Feliciano's cousin, IRENE
TORRES, lived in Staten Island but would occasionally return to
Bushwick, where she used to live, to visit her mother Iris
Velazquez, her family, and her friends (Torres: 184-87, 189,
191).    During one such visit early that summer, Ms. Torres saw
defendant sitting on the steps leading to her parents house
(Torres: 189-90).   Ms. Torres greeted defendant and observed that
he appeared to be angry (Torres: 190).    When Ms. Torres asked
defendant what was wrong, defendant said "I just had a fight with
your fucking cousin, she's getting to the point where I'm going
to put it on her one day" (Torres: 190, 203).    Defendant also
told Ms. Torres that he was "fed up with her [Feliciano's] shit"
(Torres: 203).

During the day before the shooting, Ms. Velasquez saw
defendant smoking marihuana and drinking beer outside his home
(Velasquez: 232, 234).    Defendant was wearing a green football
jersey with the number thirty four emblazoned on it, sweatpants,
and black sneakers (Velasquez: 233).    Ms. Velasquez also saw
Julissa during the day before the shooting (Velasquez: 234-35).
Julissa appeared tired and "strange" (Velasquez: 234-35).

4

On the evening before the shooting, Ms. Torres went to Brooklyn to take her mother out to eat at a T.G.I.F. in Manhattan (Torres: 196, 199, 214).  Ms. Torres met defendant across the street from her step-grandmother's house and asked him where her cousin was, to which defendant replied, "Don't ask me about that fucking girl, because she's somewhere up the hill" (Torres: 197, 200).  Ms. Torres then went across the street to the front of her step-grandmother's house where she met her mother (Torres: 196, 199, 214; Velasquez: 236).  Ms. Torres invited her mother to go with her to T.G.I.F. but her mother declined the invitation, explaining that she had already accepted an invitation to dinner with her mother-in-law, but suggested that Ms. Torres take defendant instead (Velasquez: 237, 254).  When defendant told Ms. Torres that he wanted to go to T.G.I.F., Ms. Torres said that she had changed her mind and no longer wanted to go to dinner (Torres: 196, 199; Velasquez: 238, 256-57).

Defendant remained for a few minutes while Ms. Torres, her boyfriend, and her mother had a friendly conversation (Velasquez: 239).  Defendant left and returned with a blue towel (Velasquez: 256).  When the conversation concluded, Ms. Velasquez went inside to her mother-in-law's house for dinner (Velasquez: 256).

Wile eating dinner at her mother-in-law's house, Ms. Velasquez saw defendant through the window and went downstairs to invite defendant to join them for dinner (Velasquez: 248).  When

defendant declined the invitation, Ms. Velasquez brought defendant out some food (Velasquez: 248).

Sometime after midnight, Ms. Velazquez was returning home from her visit to her mother-in-law's house when she saw defendant in front of his house still wearing the same green jersey he had been wearing earlier that day, black "breakaway" sweatpants that could be converted to shorts, a cap, and black sneakers (Velasquez: 249-50, 259). Defendant's hair was tied in small braids (Velasquez: 246, 259-60). Defendant had a lazy eye, which Ms. Velasquez thought was his right eye (Velasquez: 253). Defendant told Ms. Velasquez that he was going to the store to buy beer, and asked Ms. Velasquez whether she needed anything from the store (Velasquez: 265). When Ms. Velasquez told defendant that she did not need anything, defendant walked around the corner and out of her line of vision (Velasquez: 264-67).

At about 1:00 that morning, SHIQUON ALSTON was walking through Irving Square Park on his way to a store when he saw Julissa, a friend and old neighbor of his, sitting on a bench in the well-lit park (Alston: 37-39). Mr. Alston sat down beside her, and they began chatting (Alston: 39). Julissa told Mr. Alston that she believed that she was going to die that night because a man who loved her but whom she did not love back was stalking her (Alston: 47). While telling Mr. Alston that she was being stalked by a man who loved her, she suddenly pointed to defendant, who was walking down the street outside the park, and

identified him as the man who was stalking her because he loved her but she did not love him (Alston: 46, 49-50).

Defendant entered the park, and, while keeping defendant in his peripheral vision, Mr. Alston, to protect Julissa, took out a wooden-handled knife, unfolded it, and placed it on his lap (Alston: 46-48, 59-60).[4]

Defendant approached the bench where they were sitting, and Mr. Alston observed that defendant was in his late twenties to early thirties, had a lazy right eye, was heavy-set, had braids, was wearing a green jersey and black pants, and was carrying a black plastic bag (Alston: 45-49, 60). Defendant ordered Mr. Alston to move away from Julissa, and Mr. Alston refused (Alston: 46, 50, 85). Several seconds later, defendant told Mr. Alston again to move away, and when Mr. Alston again refused, defendant began removing a gun from a black plastic bag (Alston: 46, 51,

---

[4] At first, Mr. Alston testified that he kept his eyes on defendant from when Julissa pointed him out until he approached the bench (Alston: 47, 49, 57). Mr. Alston later explained that what he had meant was that he had kept defendant within his peripheral vision, for most of the time, and had glanced at defendant directly every few moments (Alston: 81-83). Mr. Alston also explained that until defendant addressed him he did not want to make eye contact with defendant, and so he kept glancing at him furtively, but that after defendant addressed him, he gazed directly at defendant for a second or two (Alston: 93-94).

85).[5]  Upon seeing the handle of the gun, Mr. Alston stood up and fled, causing the knife in his lap to fall to the ground (Alston: 46, 51-52).  Mr. Alston concluded from the shape of the handle of the gun that it was a revolver (Alston: 91).  As soon as Mr. Alston began running and was only a few feet away from the bench he heard five or six shots fired in rapid succession (Alston: 51).  At first, Mr. Alston thought that the shots were fake because they sounded like they were emanating from a cap gun, but then when Mr. Alston saw a bullet lodge in a tree directly in front of him, he realized that the bullets were real (Alston: 53).  Only about one minute elapsed from when Julissa identified defendant as her stalker to when the shots were fired (Alston: 58).  After the shooting, Mr. Alston ran home, where he learned minutes later, when his brother returned home, that someone had been killed in the park (Alston: 53).  The next day, Mr. Alston

---

[5]  In a pretrial interview with an assistant district attorney and in his grand jury testimony, Mr. Alston mentioned that defendant ordered him to move away from Julissa but did not mention that defendant had asked him twice to do so (Alston: 83-85, 86-87, 88-89).  Detective Griffin testified that Mr. Alston told him that defendant ordered him twice to move away from Julissa (Griffin: 340-41).

reported to the police what he had witnessed (Alston: 54, 61; 63).[6]

Meanwhile, ALEXIS BENITEZ and his brother were heading home from a pool hall and were walking through the park when Alexis heard a gunshot (Benitez: 270-74). Alexis looked toward where the gunshot had emanated from and saw someone fall and another person stand over the fallen person and continue firing five or six more shots (Benitez: 275-77). Benitez observed that the shooter was a tall, husky, black male who had braids; that the shooter was wearing a green jersey with the number thirty four emblazoned on it; that the shooter was carrying a black plastic bag; and that, after the shooting, the shooter ran out of the park (Benitez: 275, 278-79, 281, 282). Alexis also saw a few other people run out of the park when the shots were fired (Benitez: 280). After the shooter fled, Alexis went over to the body lying on the ground and recognized the victim as Julissa, a neighborhood resident (Benitez: 279).[7]

---

[6] Mr. Alston testified at trial that he described defendant's lazy eye to the police (Alston: 66). Outside the jury's presence, the court elicited from the parties that on the day after the shooting, in the early morning of August 17, during his initial interview with the police, Mr. Alston identified defendant from a photo array (62) -- thus obviating the need of the police to record in writing at length Mr. Alston's description of defendant.

[7] Alexis recalled telling Detective O'Keefe that the shooter had been wearing a green basketball jersey with the number thirty four emblazoned on it, dark colored shorts, and that he was carrying a dark colored object in his hand (Benitez: 282). Alexis could not recall at trial, however, what type of pants the shooter had been wearing (Benitez: 282).

After the shooting, at about 2:00 a.m., defendant came to the Velasquez residence and asked Ms. Velasquez whether her husband was available (Velasquez: 251, 260). Defendant was sweating, appeared nervous, and was now dressed in different clothes from those she had seen him dressed in about an hour and a half earlier (Velasquez: 251). Defendant was now wearing a white T-shirt, a pair of sweatpants that was lighter in color than the sweatpants he had been wearing earlier, and had no cap on his head (Velasquez: 260-61). When Ms. Velasquez told defendant that her husband was not home, defendant left (Velasquez: 251). A few minutes later, Ms. Velasquez came home and told her that her niece had been killed (Velasquez: 251). At some point, defendant told Ms. Velasquez's husband that he was leaving to visit his daughter at 5:00 a.m. (Velasquez: 263). Ms. Velasquez, who prior to the shooting would see defendant every day, did not see defendant again until trial (Velasquez: 253).

After the shooting, Ms. Velasquez told her daughter Ms. Torres that Julissa told her that, "if anything was to ever happen to her, that it was [defendant] who did it," but Ms. Velasquez would not talk to her daughter about the shooting (Torres: 206; Velasquez: 255).

On the morning of the shooting, Detective JAMES GRIFFIN became the lead detective on the investigation into the shooting of Julissa Feliciano (Griffin: 307-08). Detective Griffin went to the park where he observed that Julissa had been shot

10

repeatedly and that there were powder burns present on her (Griffin: 309). Near Julissa's feet was a knife (Griffin: 310). From the following day onward, Detective Griffin began searching for defendant and would stakeout defendant's house and Ms. Velasquez's house every day (Griffin: 315).

On the morning of the shooting, at about 1:55 a.m., Detective JOSEPH BELLO, of the police department's Crime Scene Unit, was instructed to go to Irving Square Park (Bello: 112-14). Detective Bello and his partner, Detective O'Sullivan, arrived at the park at about 2:40 a.m. where they photographed and sketched a diagram of the scene of the shooting and collected evidence (Bello: 114, 120, 133-34). Detective Bello did not need to use a flashlight in his search for evidence because the park was sufficiently illuminated by streetlamps (Bello: 117-20). Detective Bello recovered at the scene a knife, a fifty-dollar bill, a plastic cup, and what appeared to be saliva on the ground (Bello: 121).

Detective Griffin interviewed Alexis Benitez, during which Benitez said that the shooter was wearing short pants (Griffin: 335). Detective Griffin interviewed Mr. Alston, during which Mr. Alston said that, as soon as Julissa saw defendant, she said to Mr. Alston that the man with the green jersey is stalking her (Griffin: 335). Detective Griffin recalled that Mr. Alston told him that defendant told him twice to move away from Julissa and that defendant had a lazy eye (Griffin: 340, 341, 360).

Detective Griffin interviewed Ms. Torres and Ms. Velasquez. Detective Griffin later interviewed Ms. Velasquez a second time. Detective Griffin prepared a report of his second interview of Ms. Velasquez but did not prepare a report of his interview of Ms. Torres because the two had said essentially the same things, and thus the detective believed that he would later be able to recall what Ms. Torres had told him without the aid of a written report (Griffin: 342-45). Detective Griffin recalled that Ms. Torres told him that defendant had threatened to "put it to" Julissa because she knew too much about him, was telling people things, and was stealing his guns (Griffin: 345). Griffin recalled that Ms. Velasquez told him that Ms. Torres had offered to take her to Coney Island, but did not recall her saying that she had been offered to be taken to T.G.I.F. (Griffin: 349-50). Ms. Velasquez told Detective Griffin that her husband told her on the morning after the shooting that defendant left at 5:00 a.m. to visit his daughter (Griffin: 353-55).

About nine months after the shooting, in May 2004, the detective learned that defendant was in Spring Valley, New York (Griffin: 317). Detective Griffin searched Spring Valley for defendant but did not find him (Griffin: 317). On May 24, 2004, the detective learned that defendant had been arrested in Suffern County (Griffin: 317). That day or the following day, Mr. Alston identified defendant, in a police arranged lineup, as the man in

the park who had drawn a gun and had ordered him to move away from Julissa (Alston: 55-57; Griffin 316-17).

Doctor KRISTIN ROMAN, an expert in forensic pathology and a medical examiner, reviewed notes of another medical examiner who had performed an autopsy on the body of Julissa Feliciano, and determined that Feliciano had sustained nine bullet wounds to her head, neck, arm, and torso (Roman: 164, 171, 176).[8]  Feliciano died of bullet wounds to her head and neck (Roman: 164-68, 174). Feliciano had ingested marihuana shortly prior to her death (Roman: 173).  Six bullets were recovered from Julissa's body (Roman: 176).

Although revolvers generally have barrels that can hold up to five or six bullets, there are some models that can hold nine or more bullets in their barrels (Griffin: 312, 318, 321-23).

LINDA CHAPMAN, an unemployment insurance investigator for the New York State Labor Department, reviewed the records of defendant's unemployment insurance claims and determined that, up until the time of the shooting, defendant was collecting unemployment checks in the sum of $205 per week (Chapman: 372-76).  In order to receive the weekly unemployment check, a person must contact the Department of Labor each week (Chapman: 374). Although defendant had still been entitled to two additional

---

[8] On August 16, 2003, Julissa's stepfather, Mr. Lopez, went to the morgue at Kings County Hospital where he identified from a photograph the remains of his stepdaughter, Julissa Feliciano (Lopez: 110).

payments of $205 each, defendant stopped collecting those checks immediately after the shooting and did not contact the Department of Labor to receive those checks (Chapman: 375-76). The last contact defendant made with the Department of Labor to obtain an unemployment check was August 10, 2003, the week preceding the shooting (Chapman: 375). Defendant was eligible to receive his two final payments until February 8, 2004, more than half a year after the shooting, but defendant did not seek to do so (Chapman: 376). During one three week period several months prior to the shooting, defendant did not make the required weekly contacts, but on that occasion -- unlike after the shooting -- defendant later contacted the Department of Labor and explained that there had been a family emergency (Chapman: 382-83). Defendant's stated address for purpose of the insurance claim was 250 Woodbine Street in Brooklyn (Chapman: 373-74).

### The Defendant's Case

The defense case was presented on October 25, 2005 (383). The parties stipulated, as part of defendant's case, that defendant's lazy eye was his left eye (384).

### The Brady Claim

Prior to trial, on October 6, 2005, defense counsel asked the court for unredacted copies of DD-5 police reports generated with respect to this case for which the defense had previously been provided copies but from which names and personal

information had been redacted (PT: 2). Among the various police reports for which counsel was seeking unredacted copies were also reports concerning two people who claimed that a woman named Janice Escuza informed them that she had been paid to bring the victim, Julissa Feliciano, to the person who killed her (PT: 6-8). Counsel also sought unredacted copies of a subsequent interview the police conducted with Janice Escuza, in which Escuza denied any involvement in Julissa's death (PT: 7-8).

Specifically, among the various DD-5 reports of which counsel was seeking unredacted copies were the following:

DD-5 #40, dated August 24, 2003, prepared by Detective Ryan:

> On this date at approx 1200 hrs I was informed by P.O. Centeno of the 083 pct informed me [sic] that he made an arrest at 104 Schaefer st and while effecting the arrest he was tlod [sic] that a female involved in this case had made a statement that she was somehow involved in the above listed [Julissa Feliciano] homicide, at this time I interviewed the following:

> Madaline Dones of 182 Stanhope st f/h/36 2/11/67 stated that while at a friends house at 104 Schaefer st the subject of the girl killed in the park arose and a female at the house said that she knows about the killing and that she helped saying she was paid to bring Julissa to the people that killed her, she furtehr [sic] told informant that she was paid $300.00 USC.

> The informant said that after everyone became angry she recanted her story and a dispute arose where the owner of the apt told "J" to get out that she is an accomplice and he didn't want her in the house, during this dispute "J" pulled a knife on the owner of home and the above informant grabbed the knife away and "J" fled the house.

> For your information . . .

15

DD-5 Follow-Up #41, dated August 24, 2003, prepared by Detective
Ryan:

> On this date at approx 1255 hrs I did interview Efrain
> Sanchez M/H/24 D.O.B. 3/17/79 104 Schaefer st 3R cell #
> 646 258 6758, he informed me that on this date a female
> known to him as Janice who he has known 8-9 months told
> him that she knew about the girl killed in the park and
> that she knew the guy who killed her, she said she
> boyght [sic] the girl to him·with a friend of her named
> Manny, Janice had said the dead girl had stolen
> $5,000.00 dollars from him and she was given $300.00 to
> help.
>
> At this time the informant satted [sic] that he became
> angry telling Janice to get out of his house, they
> argued and she pulled a knife on him, she fled the
> house and the police came and arrested him.
>
> A short time later during a second interview the male
> state to me that it was the second time she told him
> this staory [sic], the 1st being approx 1 week ago when
> they were in the park at Covert st and Evergreen
> smoking marijuana, Janice told him that she did in fact
> take money to pick up the girl but she lost her courage
> to bring the girl and instead took the girl to get food
> and cloths [sic].
>
> For your information . . .

DD-5 #42, dated August 24, 2003, prepared by Detective Ryan:

> On this date at approx 1310 hrs I spoke with Janice
> Escuza f/h/17 d.o.b. 11/25/85 AKA Blaze, she said she
> residea t [sic] 204 Weirfield, 104 Schaefer st, and
> Halsey and Evergreen[.] She denies any involvement with
> the above listed deceased only to say that before the
> victim was killed she saw her in the park, they smoked
> some weed and went to "Blacks" house on Halsey and
> Evergreen ave where she gave Julissa a shite shirt and
> gray sweatpants.
>
> Janice went on to say that later on (2WKS)she heard
> that Julissa was saying that Janice had sent some girls
> to jump her, Janoce [sic] denied this and stated she
> was looking for Julissa and if she would have found her
> she would have kicked her ass but she never found her.

16

For Your Information . . .

The prosecutor agreed to provide defense counsel with unredacted copies of the requested police reports by the following day (PT: 8-9).

On October 17, 2005, during voir dire, defense counsel acknowledged to the court that he had received, about two weeks previously, the unredacted police reports he had sought (PT: 227-28, 231-32). Defense counsel asserted that his investigator was having difficulty locating the people mentioned in the reports (PT: 229-30). Defense counsel argued that his efforts to locate those people were hampered by the People's late disclosure of those unredacted reports (PT: 231). Counsel requested that the court therefore permit him to introduce the reports into evidence at trial as a sanction for the late disclosure (PT: 231). Counsel maintained that he would use the reports to show that someone other than defendant may have killed the victim (PT: 230-33).

The prosecutor argued that the reports were irrelevant because they contained nothing more than street rumors and because Janice Escuza was a seventeen year old girl who did not have the resources to do what she allegedly said that she had done (PT: 233). The court elicited from the parties that Escuza denied to the police that she had participated in any way in the victim's death and that Escuza never named the person who allegedly paid her money (PT: 235-37). The prosecutor also

17

pointed out that Efrain Sanchez -- the person who initially told the police about Janice Escuza -- made the statement after being arrested when he threw Escuza out of her apartment (PT: 240). The prosecutor further pointed out that Efrain Sanchez said that Escuza told him a different story a week earlier:  that she had been paid to pick up the victim but that she lost had lost her courage and did not follow through and instead had given the victim food and clothes (PT: 240).

The court said that the reports could not be admitted unless they were reliable (PT: 241).  Defense counsel argued that the reports were reliable because Janice Escuza claimed that she knew the victim and because her statement was made against her penal interest (PT: 242).  The court asked defendant whether Mr. Alston had any motive to frame defendant, and counsel conceded that Mr. Alston had no such motive (PT: 244).  Counsel said that the theory of his case was that Mr. Alston was mistaken in his identification of defendant as the killer (PT: 244).  The court noted that because defense counsel's position was that Mr. Alston was mistaken -- but not that he was lying -- there was little reason to question Mr. Alston's identification in light of the fact that Mr. Alston was claiming that Julissa identified the shooter as her boyfriend and did not identify the shooter as someone to whom she owed money (PT: 245).

The prosecutor further argued in that vein that the witnesses did not see a woman point out Julissa to the shooter

and, therefore, because counsel was not asserting that the
eyewitnesses were lying but only that Mr. Alston was mistaken in
his identification, there was no reason to find reliable the
reports that Escuza pointed out Julissa to the shooter (PT: 246-
47). Defense counsel countered that Escuza may have withdrawn
and that the killer found Julissa on his own (PT: 247). The
prosecutor argued that none of Escuza's accounts, irrespective of
whether they were true, exonerated defendant (PT: 249).

The prosecutor argued that evidence that someone else may
have committed the charged crime is admissible only if the
defendant shows a sufficient nexus of the evidence to the crime,
which was lacking in this case (PT: 249). Defense counsel again
argued that the reports were reliable and cited People v.
Lumpkins, 141 Misc. 2d 581 (Sup. Ct. Kings Co. 1988), in support
of his argument (PT: 251).

The following day, prior to opening arguments at trial, the
court ruled tentatively that the reports would not be admitted as
a sanction, but stated that it might want to revisit its decision
after the People presented their trial evidence (PT: 258). The
court noted that it had informed counsel that the reports about
Escuza were unreliable because Escuza had allegedly given several
conflicting accounts about her complicity and thus even if she
were to be produced at trial, her testimony would unlikely affect
the outcome of the trial (PT: 258). Counsel argued that the
reports were inartfully written and therefore Escuza may not have

given that many different accounts about what had occurred (PT: 260-62). The court opined that because Escuza's stories were so conflicting, they appeared to be nothing more than a show of bravado on her part (PT: 264). The court reiterated that it was tentatively ruling that the reports were not admissible and that it would later revisit its decision (PT: 264).

After the People's opening statement to the jury, defense counsel again asked the court to be permitted to introduce the reports into evidence (PT: 289). Defense counsel asserted that he received the redacted DD-5 reports "some time ago, but it's not months ago" and that he received the unredacted copies even more recently (PT: 289). Counsel asserted that his investigators were having difficulty finding the people mentioned in the reports relating to Escuza because the contact information contained in them was "very stale," assuming that the contact information contained in them was ever genuine (PT: 290).

The court asked counsel, if under his argument, the People would be required to turn over any information they received on the very day that they received it (PT: 291). Counsel replied that he had asked repeatedly for unredated copies of the DD-5 reports but that the prosecutor had, instead, obtained a protective order (PT: 291). Counsel stated that he had even filed a written motion for unredacted copies of the reports; the court reviewed the file and said that there was no such motion in the file (PT: 291-92, 94). The court concluded that the request

for contact information and the resulting protective order could not have related to the reports pertaining to Escuza because they "obviously" were not going to be prosecution witnesses on whose behalf protective orders would have been issued (PT: 292). The prosecutor asserted that the first time that defense counsel had asked for unredacted copies of the reports relating to Escuza was about two weeks previously, on October 6, 2005, when the People consented to provide counsel with them by the following day (PT: 292). The prosecutor maintained that defendant had asked prior to that occasion only for unredacted reports relating to the Benitez brothers (PT: 291). Defense counsel maintained that he had asked before October 6, 2005, for unredacted copies of all DD-5 reports, and said that he could not have known to ask by name for the contact information for the Benitez brothers because their names had been redacted (PT: 293).

The prosecutor pointed out that defendant was not arrested until about nine months after the Escuza-related reports had been generated, and thus nothing could have been turned over to defendant until nine months after the reports were generated (PT: 293). The court concluded that the contact information in the reports was already stale by the time defendant was arrested (PT: 293-94). Indeed, at one point, defense counsel conceded the possibility that the people referred to in the reports may never have given accurate contact information to the police (PT: 290). The court also noted that even if the information had been turned

21

over earlier and even if counsel had located Escuza there was no
reason to conclude that Escuza would have testified favorably for
the defense, especially in light of the fact that she had already
repeatedly recanted the story that she had been involved (PT:
295).  The court stated that it was adhering to its initial
ruling for the time being and would again revisit the issue later
if fairness dictated it (PT: 299).

During trial, after the medical examiner testified, counsel
asked the court to reconsider its prior ruling because Mr.
Alston's testimony with respect to his ability to identify
defendant was inconsistent (178).  Counsel also argued that the
record showed that nine shots were fired but a revolver can hold
only six bullets and that thus the shooter must have stopped and
reloaded his gun, which was inconsistent with Mr. Alston's
testimony that the shots were fired in rapid sequence after the
first shot was fired (180).  Counsel conceded that a speed
loading device could have been used, but argued that most gun
owners do not have such a device (180).  Counsel noted that only
six bullets were removed from the victim and so three more
bullets must have been left at the scene of the shooting (180).

The prosecutor argued that counsel still had not shown that
the Escuza account was reliable (180).  The prosecutor also
asserted that some revolvers are made with barrels that can hold
many more than six bullets (181).  Counsel suggested that perhaps
two guns were used, and the prosecutor disagreed because the

witnesses saw only one shooter (181-83).  The court stated that
it would revisit its ruling after the People rested (183).

Later on in the People's case, defense counsel moved again
to be permitted to introduce the reports of the Escuza accounts
(288-96).  Counsel again argued that inconsistencies among the
People's witnesses allowed for the possibility that someone other
than defendant was the shooter (288-94).  Defense counsel also
again argued that the number of bullets a revolver can hold was
inconsistent with the accounts provided by the People's witness
(295-96).  The prosecutor again argued that counsel had failed to
show that any of the Escuza accounts were reliable (295).  The
court again noted that there was little reason to conclude that
the witnesses would have been located had the prosecutor provided
the contact information earlier, especially in light of the fact
that defendant was not arrested until nine months later, by which
time that information was already stale (299).  The court adhered
to its earlier decision (300).

The Charge Conference, the Verdict, and the Sentence

Counsel asked the court to instruct the jury that the People
failed to perform a ballistic comparison of the bullets (300).
The prosecutor argued that such an instruction was unwarranted
because the People were not required to perform that comparison
and that the defense could have performed that test had they
wished to do so (300).  The court said that it would not give the

requested charge but ruled that counsel was free to argue on summation that the People should have tested the bullets (300-01).

The jury found defendant guilty of Murder in the Second Degree (P.L. § 125.25[1]) (555-56). On November 15, 2005, the court sentenced defendant to an indeterminate term of imprisonment of twenty-five years to life (Sentencing Transcript: 10).

<u>POINT I</u>

THE   TRIAL   COURT'S   PRECLUSION   OF   POLICE   REPORTS
CONTAINING   SEVERAL   CONFLICTING   ACCOUNTS   OF   HEARSAY   WAS
PROPER   AND   ANY   DELAY   IN   PROVIDING   THE   DEFENSE   WITH
UNREDACTED   COPIES   OF   THOSE   REPORTS   DID   NOT   PREJUDICE
THE   DEFENSE.

<u>Introduction</u>

The trial court's preclusion of the police reports was proper, and any delay in providing the defense with unredacted copies of those reports did not prejudice the defense. Defendant claims that the trial court should have permitted him to introduce into evidence at trial police reports relating to purported statements made by Janice Escuza as a sanction for the People's delay in providing the defense with <u>Brady</u> material, namely, unredacted copies of those reports. Defendant is wrong because no <u>Brady</u> violation occurred.

First, as the trial court found, because defendant was not arrested until about nine months after those reports were generated, the contact information contained in those reports was already stale before the obligation to provide defendant with those reports ever arose (293-94). Second, irrespective of the fact that the contact information was stale, earlier disclosure of the contact information contained in the reports could not have helped defendant. As defendant himself concedes (Defendant's Brief at 46), there is no reasonable possibility that Janice Escuza would have testified for the defense even if

25

she had been located.   Accordingly, earlier disclosure of
Escuza's contact information could not have helped defendant,
because, as defendant himself concedes, Escuza would,
undoubtedly, have refused to assist the defense.   Similarly,
earlier disclosure of Efrain Sanchez's and Madeline Dones's
contact information could not have helped defendant because they
had only inadmissible hearsay to offer, and nothing else.
Contrary to defendant's claim, Escuza's purported hearsay
statements to Efrain Sanchez and Madeline Dones would not have
qualified for admission at trial as a declaration against
Escuza's penal interest.

First, a careful review of Sanchez's and Dones's statement
to the police shows that Escuza did not admit to committing a
crime.   In her purported statement, Escuza admitted only that
someone paid her $300 to help find Julissa because Julissa owed
that person $5,000.   Escuza never said, however, that she was
aware that the person was going to kill Julissa, rather than
simply attempt to collect the debt.

Second, a declaration against penal interest is admissible
only if the declarant is unavailable at trial.   Defendant assumes
that Janice Escuza would have been deemed unavailable at trial
because she would have asserted her Fifth Amendment right not to
testify.   Defendant's assumption is unfounded.   It is at least as
likely, if not more likely, that Escuza would have taken the
stand and affirmatively testified that she did not participate in

26

killing the victim. Indeed, when the police interviewed Escuza, she affirmatively denied having played any part in the killing of Julissa.

Third, a declaration against penal interest is admissible only if the declarant was aware that the declaration was against his or her penal interest. In this case, as argued above, Escuza did not confess to a crime. Moreover, irrespective of whether she purportedly confessed to a crime, there is little reason to conclude that Escuza, who was only seventeen years old, was aware that her bragging in an informal setting such as a party -- as opposed to a statement to the police -- could be used against her, and was as such against her penal interest. Indeed, as soon as Sanchez reputedly told her that she was admitting to being an accomplice to a crime, she immediately retracted.

Fourth, a hearsay declaration against penal interest is admissible only if surrounding circumstances -- independent of the declaration -- are present to attest to the trustworthiness and reliability of the declaration. In this case, there was nothing to attest independently to the trustworthiness and reliability of Escuza's purported declaration that she was paid to help the killer. Indeed, Escuza allegedly gave several conflicting accounts of what had occurred. Thus, her purported statements were clearly untrustworthy and unreliable. Accordingly, the trial court's preclusion of the police reports

was proper, and any delay in providing the defense with unredacted copies of those reports did not prejudice the defense.

Defendant's related claim that the police reports pertaining to Janice Escuza should have been admitted to show that the police did not properly investigate the case is unpreserved for appellate review and meritless. Defendant did not seek at trial to introduce the reports to show that the police inadequately investigated the case. Defendant, instead, sought to introduce the reports to show that someone other than defendant may have killed the victim.

Moreover, use of those reports to question the thoroughness of the police investigation was not dependent on the contact information contained in them, and thus any delay in providing the defense with the unredacted copies of those police reports did not prejudice defendant.

In any event, any error in precluding the reports under that theory did not prejudice defendant, because the police reports established that the police did indeed investigate the allegations made by Efrain Sanchez by interviewing Janice Escuza who denied in that interview that she had participated in the killing of Julissa. Defendant does not assert what else the police could have done to further that angle of the investigation.

Determination of Brady Claims

Under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, the prosecution must disclose evidence favorable to the defendant that is material either to guilt or punishment, including evidence that impeaches the credibility of witnesses. See Kyles v. Whitely, 514 U.S. 419 (1995); Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Ramos, 27 F.3d 65 (3d Cir. 1994). Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

The rule set forth in Brady v. Maryland, 373 U.S. 83 (1963), "does not direct disclosure at any particular stage of the proceedings." People v. Bolling, 157 A.D.2d 733, 733-34 (2d Dep't 1990) (quoting People v. Jemmot, 144 A.D.2d 694, 695-96 [2d Dep't 1988]). "The issue is whether the evidence was disclosed in time for defense to use it effectively." People v. Jemmot, 144 A.D.2d at 695-96. A determination of whether a defendant has been prejudiced as a result of the late disclosure of possible Brady material is based on whether the defendant had "a meaningful opportunity to use the allegedly exculpatory material to cross-examine the People's witnesses or as evidence in the defense case." People v. Cortijo, 70 N.Y.2d 868, 870 (1987). However, "Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to

disclose." United States v. Blood, 435 F.3d 612, 627 (6th Cir. 2006).

Under New York law, where a specific request for the particular material has been made, the defendant must show a "reasonable possibility" that the result of the trial would have been different but for the undisclosed material. People v. Scott, 88 N.Y.2d 888, 890-91 (1996); People v. Vilardi, 76 N.Y.2d 67, 77-78 (1990); see, e.g., People v. Rodriguez, 281 A.D.2d 644 (2d Dep't 2001) (no reasonable possibility that earlier disclosure of Brady material might have led to a different outcome); People v. Demand, 268 A.D.2d 901, 903 (3d Dep't 2000) (no reasonable possibility that late disclosure of witness's prior oral statement contributed to verdict).

Generally, where the evidence sought by the defense is inadmissible, there is no Brady obligation. See Wood v. Bartholomew, 516 U.S. 1, 5 (1995); Hoke v. Netherland, 92 F.3d 1350, 1356 (4th Cir. 1996) ("these statements may well have been inadmissible at trial under Virginia's Rape Shield Statute, and therefore, as a matter of law, 'immaterial' for Brady purposes).

The Supreme Court -- without deciding whether inadmissible evidence could ever be deemed Brady material -- expressly held that inadmissible evidence cannot be deemed Brady material if it is only speculative that it might lead to admissible evidence. See Wood v. Bartholomew, 516 U.S. at 6.

30

Even where there is a strong likelihood that inadmissible evidence would have led to admissible evidence, there is a split in the federal circuit courts about whether there is a Brady obligation. See generally, Paradis v. Arave, 240 F.3d 1169, 1178 (9th Cir. 2001) (noting that "[t]here is no uniform approach in the federal courts to the treatment of inadmissible evidence as the basis for Brady claims"); see also, e.g., United States v. Gil, 297 F.3d 93, 104 (2d Cir. 2002) (holding that inadmissible evidence that could lead to admissible evidence is Brady, but citing Hoke v. Netherland, 92 F.3d 1350, 1356 [4th Cir. 1996], as contrary authority that there is no Brady obligation under such circumstances); Breedlove v. Moore, 279 F.3d 952, 964 (11th Cir. 2002) (holding "that inadmissible evidence may be material for Brady purposes if the suppressed evidence would have led to admissible evidence" [emphasis added], and that "[i]nadmissible evidence could only rarely meet [Brady's materiality] standard"); United States v. Hemmer, 729 F.2d 10, 16 n.3 (1st Cir.), cert. denied, 467 U.S. 1218 (1984) ("Assuming this statement was Brady material, as defendants contend, it was nevertheless inadmissible.  Thus, even had it been disclosed prior to trial it could not have affected the outcome"); United States v. Ranney, 719 F.2d 1183, 1190 (1st Cir. 1983) ("Inadmissible evidence is by definition not material, because it never would have reached the jury and therefore could not have affected the trial outcome").

Even where the evidence sought would clearly lead to admissible evidence, there is a split in the federal circuit courts whether there is a Brady obligation. See, e.g., Hoke v. Netherland, 92 F.3d at 1356 (holding that as a "matter of law" inadmissible evidence does not raise Brady obligation); Breedlove v. Moore, 279 F.3d at 964 (11th Cir. 2002) (holding "that inadmissible evidence may be material for Brady purposes if the suppressed evidence would have led to admissible evidence").

There Was No Meaningful Delay Of Brady Material

Defendant was not arrested until nine months after the reports relating to Escuza were generated, and thus, as the trial court properly found (293-94), the contact information contained in those reports was already stale by the time defendant was arrested.  The reports were generated on August 24, 2003, and defendant was not arrested until May 24, 2004.  Accordingly, the contact information was already stale before the People's disclosure requirement ever arose.  Thus, defendant's assertion that the people referred to in the reports could have been located had the People disclosed their contact information earlier is completely speculative.

Defendant Was Not Prejudiced By The Delay

Moreover, defendant was not prejudiced irrespective of whether earlier disclosure would have permitted defendant to locate the people referred to in the Escuza-related reports.  As

32

defendant himself concedes (Defendant's Brief at 46), there is no reasonable possibility that Janice Escuza would have testified for the defense even if she had been located.   Accordingly, earlier disclosure of Escuza's contact information could not have helped defendant, because, as defendant himself concedes, Escuza would, undoubtedly, have refused to assist the defense.

Furthermore, neither Efrain Sanchez nor Madeline Dones could have helped defendant because they had only unreliable and inadmissible hearsay to offer.   Defendant argues that their testimony about Janice Escuza's statement would have been admissible as a declaration against Escuza's penal interest. Defendant is wrong for several reasons.

Alleged Statements Were Not Declarations Against Penal Interest

As a preliminary matter, when a criminal defendant seeks to introduce a hearsay declaration against penal interest, such declaration is admissible "[o]nly when there is other evidence tending to show that the declarant . . . _actually_ committed a crime. People v. Settles, 46 N.Y.2d at 169 (emphasis added).   In this case, under no account of Escuza's purported statements did she admit to committing a crime, because, under no account, did Escuza ever admit that she was aware that the person who paid her

intended to kill Julissa or even harm Julissa.[9]  At most, Escuza purportedly said only that she had been paid to help someone recover $5,000 that Julissa owed him, but, under no account, did she ever say that she wittingly aided or abetted in the killing or that she knew that the person intended to harm or kill Julissa.[10]  Thus, the mere fact that Escuza purportedly said that the person who paid her was the one who killed Julissa did not make Escuza an accomplice to the crime.  Accordingly, because Escuza reportedly said nothing that amounted to a confession to a crime, Escuza's statements, even if true, were altogether not statements against penal interest.  See People v. Harvey, 270 A.D.2d 959 (4th Dep't 2000) (admission to crime must be clear and unambiguous); People v. Williams, 156 A.D.2d 608 (2d Dep't 1989).

---

[9]  Although Escuza reportedly told Sanchez in the park that she took money but "lost her courage" to pick up Julissa, that statement was not an admission to being aware that the person intended to kill Julissa -- Escuza may have lost her courage because she suspected that the person might harm Julissa. Accordingly, Escuza did not admit to participating in a crime. More importantly, in that account, Escuza maintained that she never brought Julissa to the person who claimed that Julissa owed him money and instead took Julissa for food and clothes.

[10]  The police report of the interview of Efrain Sanchez reflects that Sanchez said that "a female known to him as Janice who he has known 8-9 months told him that she knew about the girl killed in the park and that she knew the guy who killed her, she said she boyght [sic] the girl to him with a friend of her named Manny, Janice had said the dead girl had stolen $5,000.00 dollars from him and she was given $300.00 to help."  The police report of the interview of Madaline Dones reflects that Dones said "that while at a friends house at 104 Schaefer st the subject of the girl killed in the park arose and a female at the house said that she knows about the killing and that she helped saying she was paid to bring Julissa to the people that killed her, she furtehr [sic] told informant that she was paid $300.00 USC."

Moreover, irrespective of whether Escuza's purported statements reflect that she committed a crime, the purported statements did not qualify as declarations against penal interest because the statements do not meet the prerequisites that must be met for a hearsay statement to be admissible as a declaration against penal interest.

Four prerequisites must be met before a hearsay statement may be admitted as a declaration against penal interest:

> (1) the declarant must be unavailable to testify;

> (2) the declarant must have been aware at the time he made the statement that the statement in question was against his penal interest;

> (3) the declarant must have competent knowledge of the facts underlying the statement; and

> (4) there must be supporting circumstances or evidence, independent of the statement itself, that attest to its trustworthiness and reliability.

People v. Brensic, 70 N.Y.2d 9, 15 (1987); People v. Thomas, 68 N.Y.2d 194 (1986); People v. Settles, 46 N.Y.2d 154 (1978); see also People v. Stultz, 2 N.Y.3d 277, 286 (2004). When a criminal defendant seeks to introduce a hearsay declaration against penal interest, "[t]he crucial inquiry focuses on the intrinsic trustworthiness of the statement as confirmed by competent evidence independent of the declaration itself." People v. Settles, 46 N.Y.2d at 169.

In assessing whether there is sufficient independent evidence to assure the reliability of a declaration against penal interest, the court must employ a case-by-case approach. While no two cases are identical, the Court of Appeals in People v. Shortridge, 65 N.Y.2d 309 (1985), set out a number of factors that are relevant to the additional trustworthiness inquiry for declarations against penal interest which include: (1) the declarant's motivation; (2) the declarant's personality; (3) the declarant's spontaneity or hesitancy, promptness or tardiness in making the statement, which may shed light on its authenticity; and (4) the internal consistency and coherence of the declaration, or its lack thereof, which may reflect on its bona fides. "Regardless of how self-incriminatory a particular declaration against penal interest might be, all or any of the foregoing may affect its reliability." Id. at 313.

In this case, defendant assumes that if disclosure had been made earlier he would have been able to locate the people referred to in the Escuza-related reports but that Escuza herself would have been deemed unavailable at trial because she would have invoked her constitutional right not to incriminate herself. Defendant's assumption is unfounded. It is more likely, that Janice Escuza -- if called as a witness at trial -- would have taken the stand and affirmatively testified that she did not participate in killing the victim. On the one hand, if Escuza was innocent, then she would have no reason to invoke her right

not to incriminate herself.  On the other hand, assuming arguendo that she did play a role, then she would have even more incentive to take the stand and deny any role in the homicide to deflect any investigation into her role.  Surely, by refusing to testify on the ground that she might incriminate herself, she would be suggesting that she indeed played a role in the killing and thereby invite further police investigation into her role. Accordingly, it is far more likely that if Escuza would have been called as a witness she would have taken the stand and affirmatively denied any role in the killing.  Indeed, when the police interviewed Janice Escuza, she affirmatively denied playing any role in Julissa's death.  Thus, it is unlikely that Escuza would have invoked her right not to incriminate herself. It is far more likely that Escuza would have taken the stand and denied any role in the homicide.  Therefore, defendant's assumption that Escuza would have invoked her right not to incriminate herself and would thereby have been deemed unavailable at trial is unfounded.  Accordingly, it is unlikely that Sanchez and Dones would have been permitted to testify to Escuza's purported hearsay statement against penal interest because it is unlikely that Escuza would have invoked her right not to incriminate herself and thereby have been deemed unavailable for trial.  Thus, the first prerequisite for admission of a hearsay declaration against penal interest militates against defendant's argument.  See People v. Ayala, 142

A.D.2d 147, 168 (2d Dep't 1988) (in determining admissibility of hearsay declaration against penal interest, it cannot be presumed that the declarant would have invoked fifth amendment privilege if called as a witness at trial and thus the declarant's unavailability cannot be assumed).

Moreover, a hearsay declaration against penal interest is admissible only if the declarant was clearly aware, at the time of the declaration, that the declaration was against his or her penal interest.  In this case, as argued above, Escuza did not confess to actually committing a crime.  Moreover, irrespective of whether she purportedly confessed to committing a crime, there is little reason to conclude that Escuza, who was only seventeen years old, was clearly aware that her bragging in an informal setting such as a party -- as opposed to a statement to the police -- could be used against her, and was, as such, against her penal interest.  See People v. Montalvo, 178 A.D.2d 147 (1st Dep't 1991) (in determining admissibility of declaration against penal interest, declarant's youthful age was factor in determining whether declarant understood disserving nature of declaration).  Indeed, as soon as people at the party reputedly told her that she was admitting to being an accomplice, she immediately retracted her statement -- thus underscoring that she may not initially have realized that a statement made by her in an informal setting such as at a party could be used against her.  This is further underscored by the fact that, when the police

contacted Escuza, she denied any participation in Julissa's death. See People v. Settles, 46 N.Y.2d 154, 168 (1978).

Furthermore, even assuming, arguendo, that Escuza's purported statements constituted an admission to a crime, there is little reason to conclude that Escuza, a mere seventeen-year old girl, was clearly aware that the acts she was purportedly admitting to having committed constituted a crime. It is not at all clear, that Escuza was altogether aware of the law of accessorial liability, let alone in a case such as this where -- even under defendant's view -- Escuza did not admit to participating in the actual homicide and where at most she admitted only to bringing the victim to the killer. This is underscored by the fact that as soon as people at the party reportedly .told her that she was admitting to being an accomplice, she retracted her admission -- thus showing that she may not have initially been aware that her purported admitted actions constituted a crime. Accordingly, the second prerequisite for admitting declarations against penal interest also militates against defendant's argument.

Furthermore, Escuza's purported statements were untrustworthy and unreliable for several reasons. Escuza reportedly gave several different versions of what had occurred. In the first account, Sanchez told the police that he had been in a park with Escuza when she told him that she was given $300 to pick up Julissa but that Escuza had lost her courage and instead

had taken Julissa to get food and clothes. Accordingly, in that account, Escuza denied participating in Julissa's death. In the second account, Julissa reportedly said at a party that she brought Julissa to the person who killed her -- though Escuza did not say even in that account that she was aware that the man intended to kill Julissa. In the third account, immediately after she reportedly made that statement at the party, she reportedly recanted her story to the people at the party. In the fourth account, when the police contacted Escuza, she denied having participated in any way in Julissa's death. Escuza did not admit in her statement to the police that anyone even attempted to pay her $300. Accordingly, because Julissa reportedly gave several conflicting accounts of what had occurred, her statements were not trustworthy and reliable.

Defendant argues that it is not surprising that Escuza ultimately recanted to the police, because she did not want to be held accountable for her deeds. However, defendant overlooks a most important fact; Escuza reportedly first told Sanchez that she, in fact, did not bring Julissa to the man who paid her. Accordingly, even before anyone accused Escuza of being an accomplice, she had already denied -- in one account -- that she had played an actual role in Julissa's death. In any event, a declaration against penal interest is admissible as an exception to the hearsay rule because the declarant is opening himself up

40

to punishment, and in this case, the alleged declarant actively sought to avoid punishment.

Moreover, as argued above, Julissa allegedly made the incriminating statement at a party. Accordingly, in evaluating the trustworthiness and reliability of that statement, the court was entitled to consider that the alleged statement of a youthful girl during a party could have constituted nothing more than bluster or bravado. See People v. Abdullah, 134 A.D.2d 503 (2d Dep't 1987) (vague confession apparently made to impress investigator was unreliable declaration against penal interest). Additionally, the fact that Escuza's alleged admission at the party contained no details about the actual killing further casts doubt on the veracity of her story.

Furthermore, contrary to defendant's contention, there were no supporting circumstances or evidence, independent of the statement itself, that attested to the trustworthiness and reliability of Escuza's purported statement. Defendant argues that the number of shots Julissa sustained suggests that there was more than one shooter and thereby corroborates Escuza's alleged account. Defendant is wrong.

First, defendant argued to the jury on summation that the number of gunshot wounds indicates that there must have been more than one shooter, but the jury, in convicting defendant, implicitly rejected that argument. Second, the unrebutted testimony of Detective Griffin was that some revolvers have

41

barrels that can hold nine or more bullets. Third, defendant conceded at trial that the revolver could have been quickly reloaded with a speed loading device (180). Fourth, because Mr. Alston fled after the first shot and Benitez was standing at a distance during the shooting, it is possible that defendant had two guns in his bag and quickly drew the second after emptying the barrel of the first. Fifth, two unrelated and disinterested eyewitnesses with no motive to lie independently testified that there was one shooter, not two. Sixth, defendant's premise that there was more than one shooter does not corroborate Escuza's alleged account. Sanchez told the police that Escuza said at the party that she knew "the guy" who killed Julissa. Thus, according to Sanchez, Escuza said that there was only one killer, not two. And even though Dones told the police that Escuza said that she brought Julissa to the "people" who killed her, Dones did not state that Escuza expressly said that there was more than one shooter. Accordingly, a synthesis of the reports by Dones and Sanchez would suggest that Escuza reportedly said that more than one person was present during the shooting who wanted Julissa dead but that there was only one shooter. Thus, the number of gunshots Julissa sustained does not tend to corroborate Escuza's alleged statement.

Defendant also argues that Escuza's alleged statement was corroborated by the fact that she knew that Julissa had run afoul of various drug dealers (Defendant's Brief at 46-47). Defendant

42

is wrong.   First, none of the alleged accounts of Escuza's
statements reflect that Escuza ever said that Julissa had run
afoul of drug dealers.   The reports reflect only that Escuza
asserted that someone claimed that Julissa owed him $5,000.
Second, the fact that Escuza reportedly asserted that Julissa was
in debt did not tend to corroborate that Escuza participated in
the killing.   Escuza also reportedly asserted that she knew
Julissa before Julissa was killed.   Thus, the fact that Escuza
reportedly was aware that Julissa was in debt, at most, might
tend to corroborate only that Escuza may have known Julissa but
in no way corroborates that Escuza participated in the killing.
Moreover, the assertion that Julissa was in debt was itself based
on unreliable hearsay.

Defendant argues that Escuza's statement was further
corroborated by the fact that she claimed that she smoked weed
with Julissa in the park on the day Julissa was killed.
Defendant is wrong.   First, obviously Escuza's statement itself
cannot serve as corroborating evidence that is independent of her
statement.   Second, in none of the accounts did Escuza ever
reportedly say that she even saw Julissa on the day Julissa was
killed.   Third, Escuza's statement -- that she once smoked weed
with Julissa -- was made as part of her statement to the police
denying any role whatsoever in the killing.   Surely her
exonerating statement cannot serve to corroborate her purported
inculpating statement.   Accordingly, there is no independent

43

evidence or independent circumstances that tend to corroborate Escuza's alleged accounts.

### Escuza-Related Testimony Would Not Have Affected Trial Outcome

In any event, there is no reasonable probability, or even reasonable possibility, that testimony by Dones and Sanchez would have affected the outcome of the trial. The jury would have been confronted with the fact that Escuza reportedly gave multiple conflicting accounts of what occurred, and thus the credibility of her alleged hearsay statements would have been seriously impeached. Moreover, the jury would have had to consider that for defendant to have been the victim of mistaken identity, he would have had to have been the victim of an incredible run of bad luck and coincidence. First, the jury would have had to find that the description of the shooter by two independent and disinterested witnesses only coincidently matched that of Julissa's ex-boyfriend, defendant. Second, the jury would have had to find that Mr. Alston, who did not otherwise know defendant, viewed a lineup and wrongly chose -- from among all the other fillers in the police arranged lineup -- defendant who by coincidence just happened to have been Julissa's ex-boyfriend. Third, the jury would have had to find that, for some inexplicable reason, Julissa told Mr. Alston that the shooter was someone who loved her, when in fact it was not a lover but someone to whom she owed money who only coincidently resembled

defendant.  Fourth, the jury would have had to find that the wife of defendant's best friend, Ms. Velazquez, who had given defendant food to eat on the day of the shooting, decided to lie about the fact that defendant repeatedly threatened to kill Julissa, that defendant was wearing clothes that matched that of the shooter immediately prior to the shooting and that he changed his clothes immediately after the shooting, and that he came to her apartment in the middle of the night shortly after the shooting appearing nervous.  Fifth, the jury would have had to find that it was only coincidence that defendant left home immediately after the shooting and did not return for the following nine months until he was arrested upstate and that it was only coincidence that defendant decided to forgo collecting his remaining unemployment checks which would have provided the police with his forwarding address.

Moreover, testimony by Dones and Sanchez would not have been inconsistent with defendant's guilt.  Defendant could have paid Escuza to lure Julissa to him.  Defendant's assertion that the Escuza named Manny as the shooter is erroneous.  The police report reflects that Escuza reportedly told Sanchez that she used Manny to help her in her quest to bring Julissa to the killer, not that Manny was the killer.

In sum, there is no reasonable probability, or even any reasonable possibility, that earlier disclosure of the contact information contained in the reports would have resulted in a

different outcome at trial. Defendant concedes that Escuza would not have helped the defense. And Dones and Sanchez could not have helped the defense even if they had wanted to. All they had to offer were reports of hearsay statements that would have been inadmissible at trial because the statements would not have qualified as declarations against penal interest. Because Dones and Sanchez simply had nothing more to offer then some vague hearsay, earlier disclosure of their contact information could not even have led to admissible evidence. See Wood v. Bartholomew, 516 U.S. at 6 (inadmissible evidence is not Brady material if the possibility that it might lead to admissible evidence is merely speculative). In any event, there is no reasonable probability, or even reasonable possibility, that their testimony would have affected the outcome of the trial even if they would have been permitted to testify.

Defendant's extensive reliance on Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001), is misplaced. In Leka, unlike this case, the delayed disclosure by the prosecution of a witness with exculpatory information clearly prejudiced the defense because the delayed disclosure effectively prevented the defense from calling the witness who would otherwise have been available and who clearly had pertinent admissible exculpatory evidence to offer. Id. In this case, in stark contrast, defendant's assertion that the witnesses would have been available had

46

earlier disclosure been made is purely speculative, and moreover, neither Sanchez nor Dones had any admissible evidence to offer.

Reasonable Probability Standard Governs Review Of This Claim

Defendant's claim that that the standard governing review of this claim is whether there is any reasonable possibility that the outcome of the trial was affected by the delayed disclosure of the contact information.  Defendant is wrong.  The standard governing review of this claim is whether there is any reasonable probability that the outcome of the trial was affected by the delayed disclosure.  In any event, as argued above, there is not even a reasonable possibility that the outcome of the trial was affected by the delayed disclosure.

Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  Where, however, a specific request for the particular material has been made, the defendant must show a "reasonable possibility" that the result of the trial would have been different but for the undisclosed material. People v. Scott, 88 N.Y.2d 888, 890-91 (1996); People v. Vilardi, 76 N.Y.2d 67, 77-78 (1990); see, e.g., People v. Rodriguez, 281 A.D.2d 644 (2d Dep't 2001) (no reasonable possibility that earlier disclosure of Brady material might have led to a different outcome); People v. Demand, 268 A.D.2d 901, 903 (3d

Dep't 2000) (no reasonable possibility that late disclosure of witness's prior oral statement contributed to verdict).

In this case, the trial court did not find that there was any delay between defendant's specific request for the contact information and the disclosure of that information. Prior to trial, on October 6, 2005, defense counsel specifically requested that he be given unredacted copies of the Escuza-related reports, and the prosecutor agreed to provide them by the next day (PT: 2, 89). Several days later, on October 17, 2005, defense counsel informed the court that he received the reports in accordance with the agreement reached by the parties on October 6, 2005 (P: 227-28, 231-32). Thus, there was no delay in providing the material after it was specifically requested on October 6, 2005.

After the People's opening at trial, defense counsel alleged before Judge Feldman that he had also specifically requested the contact information earlier, in front of another judge, but that the prosecutor had sought and had obtained a protective order by asserting that the people referred to in the police reports were prosecution witnesses.[11]  In response, the prosecutor said that counsel had earlier specifically requested unredacted copies of the Benitez-related reports for which the prosecutor obtained a protective order on the ground that Benitez was a prosecution

---

[11]  Defendant asserts on appeal that he sought an order directing disclosure from Judge Walsh before he sought the order from Judge Feldman (Defendant's Brief at 4).  Defendant fails to cite any record support for that assertion.

witness.   The prosecutor denied, however, that counsel had previously specifically requested unredacted copies of the Escuza-related reports.

Indeed, defendant's assertion on appeal that the prosecutor obtained a pretrial order precluding discovery of the contact information contained in the Escuza-related reports on the ground that the people referred to in those reports were prosecution witnesses is patently absurd.   Surely, trial counsel and the court would have seen through any such transparent attempt of classifying the people referred to in the Escuza-related reports as prosecution witnesses.   Thus, the prosecutor's assertion that a protective order had been issued solely with respect to the Benitez-related reports makes far more sense.

Moreover, the court elicited from defense counsel that counsel had specifically requested in a _written_ motion the unredacted reports relating to Escuza.   The court reviewed the court's file and then said that it had found no such written motion in the file (PT: 291-92, 94).   Accordingly, defendant's assertion that he had previously specifically requested in a written motion unredacted copies of the Escuza-related reports was not only contradicted by the prosecutor, it was belied by the fact that the court found no such written motion in the court's file.

Defense counsel argued at trial that he could not have specifically requested unredacted copies of only the Benitez-

related reports because he did not know Benitez's name until he received the unredacted copies of those reports (PT: 293). That argument was patently specious because counsel might have asked, for example, for unredacted copies of DD-5 reports relating to the observation of a witness walking with his brother through the park during the shooting -- which in retrospect happens to be Benitez-related reports.

Furthermore, defendant asserts on appeal that trial counsel maintained that he had specifically requested the Escuza-related reports months prior to the disclosure. Defendant's present assertion is wrong. Counsel told the court that he had repeatedly requested the unredacted reports previously but conceded that it was "not months" previously that he had requested them (289, emphasis added). Thus, even according to defendant's own assertion at trial, not even two months elapsed from when he specifically requested the unredacted reports until he received them. The purported delay of less than two months in a timeframe spanning more than two years from when the reports were generated until defendant presented his case at trial was insignificant. This is especially so when considering that more than twenty two months elapsed from when the information was generated until defendant specifically requested it and when considering that defendant received the unredacted reports more than two and a half weeks before he presented his case at trial. Accordingly, even according to defense counsel's assertion at

trial -- which was contradicted by the prosecutor and undermined by the contents of the court's file -- the delay in turning over the unredacted reports after defendant specifically requested them was insignificant.

In sum, because there was no delay -- or at most a minimal delay if crediting defendant's assertion, which was undermined by the contents of the court's file -- in providing defendant with the reports after he specifically requested them, the standard governing review of his claim is whether there is a reasonable <u>probability</u> that the outcome of the trial would have been different.

## The Police Investigation Claim Is Unpreserved For Review

Defendant's related claim that the police reports pertaining to Escuza should have been admitted to show that the police did not properly investigate the case is unpreserved for appellate review and meritless.   Defendant did not seek at trial to introduce the reports to show that the police inadequately investigated the case.   Defendant, instead, sought to introduce the reports to show that someone other than defendant might have killed the victim.

The difference is not insignificant.   Under the latter theory -- the theory advanced by defendant at trial -- the reports could have served as evidence in chief that someone other than defendant may have killed the victim.   By contrast, under

51

the former theory, the evidence would have been admissible solely to question the thoroughness of the police investigation into the case, but would have been inadmissible to show that someone other than defendant may have killed the victim. Accordingly, defendant's claim is unpreserved for appellate review because defendant never stated at trial that he was seeking to introduce the reports for the limited purpose of questioning the thoroughness of the police investigation, and thus the court had no occasion to consider whether it would be admissible under that theory for that limited purpose. See C.P.L. § 470.05(2); People v. Wood, Slip Op. 3955, 2007 N.Y. App. Div. LEXIS 5697 (2d Dep't May 1, 2007) (defendant failed to preserve his specific arguments regarding the late disclosure of Brady material); see also People v. Gray, 86 N.Y.2d 10 (1995); People v. Rodriguez, 281 A.D.2d 644, 645 (2d Dep't 2001).

## The Police Investigation Claim Is Meritless

Moreover, cross-examination of the police at trial about how thoroughly they investigated the allegations contained in the reports was in no way dependent on whether the people referred to in those reports could be located for trial. Accordingly, defendant's assertion that the delay in providing him with unredacted copies of those reports prejudiced him in this regard is meritless because cross-examination of the police at trial

about the thoroughness of their investigation was not dependent on the availability of the people referred to in those reports.

In any event, any error in precluding defendant from using the reports to question the thoroughness of the police investigation did not prejudice defendant, because the police reports established that the police did indeed investigate the allegations made by Efrain Sanchez by interviewing Janice Escuza who denied in that interview that she had participated in the killing of Julissa. Defendant does not assert what else the police could have done to further that angle of the investigation. See United States v. Patrick, 248 F.3d 11, 23 (1st Cir. 2001) ("speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value"). Moreover, in light of the fact that the evidence of defendant's guilt was overwhelming even when considering the police investigation, as outlined above, any error in precluding the defense from exploring at trial the thoroughness of the police investigation was harmless.

POINT II

DEFENDANT'S CLAIM THAT HE WAS DENIED A FAIR TRIAL
BECAUSE THE COURT ELICITED HEARSAY EVIDENCE FROM A
PROSECUTION WITNESS IS UNPRESERVED FOR APPELLATE REVIEW
AND MERITLESS.

Defendant's claims regarding the court's elicitation of
evidence are unpreserved for appellate review.  Defendant claims
that he was denied a fair trial because the court assumed a
prosecutorial role by eliciting evidence during defendant's
cross-examination of a prosecution witness.  Defendant also
claims that he was denied a fair trial by that elicitation of
evidence because the evidence elicited was hearsay.  Both of
those claims are unpreserved for appellate review because
defendant did not object to the elicitation of that evidence on
either of those two grounds.  At trial, when the court elicited
the evidence, defendant generally objected without specifying any
ground for his objection but later clarified that the reason he
objected to the elicitation of that evidence was for an entirely
different reason:  because the witness's response was
unresponsive to the question posed (403; see Defendant's Brief at
25).

Moreover, the fact that defendant is raising two different
claims on appeal based on a single unspecified general objection
at trial itself shows that the unspecified general objection was

insufficient to alert the court to the specific ground or grounds for his objection.

Furthermore, ironically, during defendant's summation, the prosecutor urged the court to preclude reference to the conversations between Ms. Torres and Ms. Velasquez because they were hearsay, but defendant, instead of agreeing with the prosecutor and then requesting that the testimony be stricken, insisted that he should be permitted to refer to it in his summation (400-05). Accordingly, the arguments defendant raises on appeal in support of his claims are unpreserved for appellate review. See C.P.L. § 470.05(2); People v. Yut Wai Tom, 53 N.Y.2d 44, 56 (1981) (in order to preserve an improper judicial interference claim defense counsel must object to the conduct at a meaningful time during trial); People v. Aponte, 236 A.D.2d 617 (2d Dep't 1997) (defendant failed to preserve claim that court's examination of witnesses at trial denied him a fair trial); People v. Smith, 222 A.D.2d 463 (2d Dep't 1995) (same).

Moreover, defendant's claim of judicial interference does not require reversal in the interest of justice because the claim is meritless. It is well settled that, "neither the nature of our adversary system nor the constitutional requirement of a fair trial preclude a trial court from assuming an active role in the truth seeking process." People v. Jameson, 47 N.Y.2d 882, 883 (1979) (citation omitted). Indeed, the trial judge has a "vital role in clarifying confusing testimony and facilitating the

orderly and expeditious progress of the trial." People v. Yut Wait Tom, 53 N.Y.2d at 57.   As such, a judge may "seize the affirmative, when proper and necessary, to clarify perplexing issues [and] to develop significant factual information" People v. DeJesus, 42 N.Y.2d 519, 523 (1977).   Nevertheless, the trial court must continue to "participate evenhandedly in the proceedings," People v. Jones, 242 A.D.2d 542, 543 (2d Dep't 1997), and such power should "be exercised sparingly, without partiality, bias or hostility." People v. Jameson, 47 N.Y.2d at 883.

In this case, the court, in asking the witness one or two questions, was simply seeking to clarify some confusing testimony.   During cross-examination, Irene Torres testified that she would often attempt to speak to her mother about defendant but in response "would get the same thing that I would always get from her" (Torres: 205).   The court was apparently confused about two things relating to that testimony.   The first thing the court was apparently confused about was whether all of the conversations occurred after the shooting or whether some of them occurred prior to the shooting.   The second thing that the court was apparently confused about was that the syntax of Ms. Torres's testimony suggested that the answer Ms. Torres would always get from her mother was something about which Ms. Torres had already testified to.   Thus, the court was apparently attempting to determine what specifically Ms. Torres was referring to.

56

Moreover, the fact that the court asked one or two clarifying questions during defendant's cross-examination of Irene Torres would not have appeared unusual to the jury, because the court had previously addressed brief questions during the prosecutor's examination of witnesses as well -- about which defendant does not complain of on appeal (see Lopez: 109; Bello: 154).

Additionally, the court asked only two factual questions of defendant after she gave confusing testimony, and thus, this was hardly a case of excessive or an overtly hostile intervention on the part of the court.  See People v. Jameson, 47 N.Y.2d at 884 (court did not exceed proper bounds of its supervisory role where neither side was singled out for special treatment nor hostility and court intervened "rather infrequently and . . . only when necessary to aid the jury in understanding the legal and factual issues presented"); People v. Brown, 256 A.D.2d 1109 (4th Dep't 1998) (court did not assume role as prosecutor in its questioning of witnesses where "court did not unnecessarily or excessively interfere in the presentation of proof . . . nor did he convey to the jury his opinion concerning the credibility of the witnesses or the merits of the case"  [citations omitted]); cf. People v. Yut Wai Tom, 53 N.Y.2d at 58 ("Judge should rarely, if ever, indulge in an extensive questioning of the witnesses for either side" [emphasis added]).

Similarly, defendant's claim that he was denied a fair trial by the court's elicitation of hearsay evidence does not require reversal in the interest of justice. Counsel affirmatively used that evidence to benefit the defense in two different ways. First, defendant elicited from Ms. Torres that her mother's statement to her was not recorded in a written police report (206). Second, on summation defendant sought to cast doubt on Irene Torres's credibility as a witness by arguing that Ms. Torres's mother, Ms. Velasquez, did not assert in her testimony that she ever had such conversations with her daughter (399-400, 405). Indeed, on summation, when the prosecutor argued that the conversations were hearsay (399-400) -- instead of agreeing with the prosecutor and requesting that the evidence be stricken from the record -- defense counsel urged the court to reject that argument (400-05). Thus, defendant should not now be heard to say that he was denied a fair trial by the elicitation of that evidence.

In any event, the elicitation of that evidence was harmless. First, the fact that Julissa was afraid that defendant was going to kill her was already properly elicited from Mr. Alston, who testified that immediately prior to the shooting Julissa told him that she was being stalked by defendant and that she believed that he was going to kill her. Second, Ms. Torres and Ms. Velasquez also properly testified that defendant had repeatedly threatened to harm or kill Julissa. Accordingly, the

58

elicitation of evidence that Julissa also told Ms. Velasquez, at some undisclosed time prior to the shooting, that she was afraid of defendant was merely cumulative of other evidence.

Indeed, the evidence of defendant's threats about which defendant does not complain was more compelling than the evidence about which defendant does complain. Mr. Alston testified that Julissa said within minutes of her being killed that she was afraid that she would be killed that night, whereas Ms. Torres testified that her mother told her that, at some unknown time in the past, Julissa said she felt threatened. Mr. Alston testified that Julissa told him that she felt threatened because she was being stalked, whereas Ms. Torres did not say that Julissa gave any concrete reason for her feelings. Mr. Alston testified that Julissa was afraid that defendant was going to kill her that very night and Ms. Velasquez and Ms. Torres testified that defendant had repeatedly threatened them that he was going to kill Julissa, but in the conversation about which defendant complains, no specific threat is mentioned only that Julissa said that if anything happens to me it was defendant who did it. Indeed, in the challenged statement, Julissa did not even expressly state whether she was referring to a good thing or a bad thing that might happen to her, only that she believed that defendant would play a role in anything that would happen to her.

In sum defendant's claims are unpreserved for appellate review and reversal of the conviction is not required in the

interest of justice because the claims are meritless. Accordingly, defendant's judgment of conviction should be affirmed.

<u>CONCLUSION</u>

<u>FOR ALL OF THE ABOVE REASONS, DEFENDANT'S JUDGMENT OF
CONVICTION SHOULD BE AFFIRMED</u>.

Dated:  Brooklyn, New York
        June 15, 2007


                              Respectfully submitted,


                              CHARLES J. HYNES
                              District Attorney
                              Kings County



LEONARD JOBLOVE
SOLOMON NEUBORT
Assistant District Attorneys
      of Counsel

Certificate of Compliance
Pursuant to 22 NYCRR § 670.10.3(f)

This brief was prepared on a computer.  A monospaced typeface was used, as follows:

    Name of typeface:  Courier New
    Point size:  12
    Line spacing:  Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 14,000.


                        Solomon Neubort
                        Assistant District Attorney